UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Civil No. 05-2025 RHK/AJB

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | **REPORT AND RECOMMENDATION** |
| ) | **ON PETITION TO DETERMINE** |
| v. ) | **PRESENT MENTAL CONDITION** |
| ) | **UNDER 18 U.S.C. § 4245** |
| JAMES M. BROWN, ) | |
| ) | |
| Defendant. ) | |

This matter came on for evidentiary hearing before the undersigned United States Magistrate Judge on October 25, 2005, at the Federal Medical Center ("FMC") in Rochester, Minnesota, on the government's petition to determine the present mental condition of an imprisoned person pursuant to 18 U.S.C. § 4245. Mary Trippler, Assistant United States Attorney, appeared on behalf of petitioner United States of America.  Kate Menendez, Assistant Federal Public Defender, appeared for respondent, James Brown.

Based upon the testimony heard and exhibits received at hearing and upon all the files, records and proceedings herein, the Court makes the following findings of fact, conclusions of law and recommendation for disposition of the petition.

**FINDINGS OF FACT**

1. Respondent is a federal prisoner presently incarcerated at FMC Rochester.  He is currently serving a 90-month sentence for possession of a firearm by a felon and possession with intent to distribute cocaine base.  He is due to be released via good conduct on December 28, 2007.  Respondent was transferred to FMC Rochester in March, 2005, for evaluation and treatment.

2. Respondent was evaluated by, among others, Dr. D. Christine Sigurdson, Chief of Psychiatry at FMC Rochester.  Dr. Sigurdson is board-certified in her area of specialty and is an experienced evaluator.  The parties stipulated to her qualifications as an expert, and her resume was admitted in evidence as Government Exhibit 1.  Dr. Sigurdson's evaluation of respondent included review of his medical and central files, consultation with other medical staff who interviewed or followed respondent, as well as Dr. Sigurdson's personal interviews with respondent.

3. Based upon the evaluation performed and upon her education, training and experience, Dr. Sigurdson formed the opinion, to a reasonable degree of medical certainty, that respondent suffers from a mental disease or defect within the

meaning of 18 U.S.C. § 4245, namely schizophrenia, paranoid type. A copy of Dr. Sigurdson's report of evaluation was admitted in evidence as Government Exhibit 2. Dr. Sigurdson testified that schizophrenia is a psychotic disorder in which a person losses touch with reality and can involve both hallucinations and delusions.

    4. Dr. Sigurdson testified that respondent had a history of mental illness before coming into Bureau of Prisons custody. Respondent reported that he had mental health treatment in the 1980s in Pennsylvania. He said that a woman living in his apartment building, but who he had never met, was impeding him from getting a job by telling potential employers not to hire him. Respondent also said that he had to carry a gun to protect himself from this neighbor. He reported being given Cogentin, a drug given in tandem with anti-psychotic medication.

    5. Respondent first came to the attention of the mental health professionals at the Bureau of Prisons in November, 2001, when he was a pretrial inmate at the Metropolitan Detention Center in Philadelphia, Pennsylvania. During screening there, respondent reported hearing voices and said that he lost his "grasp on reality" when talking to people. He was guarded and

suspicious and appeared to exhibit paranoid delusions, including that doctors were trying to kill him or make him sick. Respondent was referred to psychiatric evaluation and was diagnosed with schizophrenia, undifferentiated type. He declined treatment and was placed in psychiatric observation for monitoring. He continued to report concerns about the safety of his food and other inmates.

   6.   In March, 2002, respondent was transferred to FMC Lexington, Kentucky, to determine whether he was competent to stand trial. He remained guarded and refused to move to general inmate housing and be around other inmates. He also refused routine tuberculosis testing. He was diagnosed with personality disorder with antisocial traits and was found competent for trial.

   7. Following his conviction, respondent was transferred to the Federal Correction Institution at Elkton, Ohio, where he again began showing symptoms of mental illness. In October, 2003, he requested placement in the Special Housing Unit ("SHU"); he said other inmates changed television channels on him and told him that he smelled. In October, 2004, he began to report that he heard the "voice of God." He became increasingly

4

paranoid about other inmates talking negatively about him and appeared to become fixated on a female staff member. Respondent reported concerns about this food, stating that he ate government food only because he drank a "special potion from God" after eating. The special potion consisted of milk and water. Respondent also received a number of incident reports for failing to participate in work and programming and failing to take required medical tests, all of which Bureau of Prisons staff felt were related to respondent's paranoia and his desire to be separate from other inmates. Mental health staff at FCI Elkton diagnosed respondent as suffering from schizophrenia with symptoms of paranoid and possible auditory hallucinations.

8. In March, 2005, respondent was transferred from FCI Elkton to FMC Rochester for mental health evaluation. On his arrival at FMC Rochester, respondent exhibited a flat affect, pressured speech and vague paranoid ideation, and his thoughts contained loose associations and incoherent references. He admitted hearing the voice of God but denied that it was related to mental illness. He was diagnosed with schizophrenia, paranoid type, and polysubstance abuse in remission.

9. While at FMC Rochester, respondent has continually

resided in the prison hospital setting and has refused to participate in work or other programming. He has also refused routine tuberculosis testing. Refusal of testing would normally require that an inmate be placed in SHU; however, Dr. Sigurdson did not believe that SHU was an appropriate therapeutic milieu for someone with respondent's diagnosis.

    10.  In May, 2005, Dr. Daniel Shine, a psychiatrist at FMC Rochester, recommended that respondent be returned to a mainline correctional institution. However, by late June, 2005, Dr. Sigurdson realized that respondent was not capable of participating in work or other programming and was not able to reside outside the prison hospital's therapeutic milieu. By that time, respondent was also reporting significant persecutory delusions. He described to mental health staff that a woman he called "9-10" influenced a federal judge to give him a long sentence and had influenced a correctional officer to poison respondent's food. Respondent also reported that prison staff had killed several of his friends. He ate only three days a week because God put him on a diet. He also drank his special potion after eating so that the poison would leave his body.

    11.  At this time, respondent also suffered from other

6

symptoms of mental illness.  He was reported to splash himself with water from his toilet.  He indicated that "9-10" was able to somehow caress him sexually even though she was not present.  He talked about his unusual beliefs, including that Jesus told him not to work or take medical tests and that he was cured of everything and would not get sick.  He said that the Lord gave him special powers, calling him Cyprus, and giving him the ability to transfer the souls of the dead from the "old world" to the "new world."  He also had the power to let the dead live again.  Respondent also reported that he did not have to prepare for release from prison because God would reward him on release.  Every time he snapped his fingers, $50,000 would appear in his hands, a gift shared only by Donald Trump and the Pope.

    12.  Dr. Sigurdson testified that respondent was not capable of functioning in a less restrictive environment that the prison hospital because his mental illness would make him vulnerable to other inmates in a regular prison setting as behaviors that are tolerated in a hospital are not tolerated in such a setting.  The hospital is also more structured and there is greater supervision that a regular prison setting.  In addition, respondent's paranoia increases when he is placed with other

inmates and he asks to be placed in SHU to relieve his paranoia.

13.  Respondent has been regularly offered treatment for his mental illness while at FMC Rochester but declines to accept it. He has no insight into his mental illness.  His psychotic symptoms interfere with his ability to accept treatment, to function and to interact meaningfully with others.  Because he refuses medical assessment and does not eat properly, he is also at risk for long term medical problems.  His symptoms also prevent him from engaging in release planning or integrating into society after release.  Respondent indicates that he will carry a gun after release from his current sentence.

14.  Dr. Sigurdson testified that, if respondent is not committed for care and treatment of his mental illness, he anticipates that his grandiose and delusional beliefs will continue to preclude him from being able to live and function in a normal prison environment outside of a hospital setting, that he will continue to refuse work and programming and will continue to request confinement in SHU, and that it is

unlikely that he will be able to make release plans or re-integrate into society upon release.

15. If respondent is committed for care and treatment of his mental illness, Dr. Sigurdson anticipates a positive prognosis: that respondent can live outside the prison hospital setting, develop insight into his mental illness and can engage in appropriate release planning.

16. It is Dr. Sigurdson's opinion to a reasonable degree of medical certainty that respondent is currently in need of custody for the care and treatment of his mental illness and that such care and treatment is more than merely beneficial.

17. Dr. Sigurdson also opines to a reasonable degree of medical certainty that FMC Rochester or a similar prison hospital setting is an appropriate facility for the necessary care and treatment. Such facilities provide the full panoply of therapies and programming and a range of housing options.

18. In rendering her opinions, Dr. Sigurdson relied on respondent's's medical and central files which were admitted in evidence as Government Exhibit 3.

**CONCLUSIONS OF LAW**

1. Petitioner United States has shown by a preponderance of evidence that respondent presently suffers from a mental disease or defect within the meaning of 18 U.S.C. § 4245, namely schizophrenia, paranoid type.

2. Petitioner United States has shown by a preponderance of evidence that respondent is in need of custody for the care and treatment of his mental illness within the meaning of 18 U.S.C. § 4245.

3. Petitioner United States has shown by a preponderance of evidence that  FMC Rochester or a similar prison hospital setting is an appropriate facility to provide the care and treatment respondent requires for his mental illness.

**RECOMMENDATION**

Based upon the testimony of Dr. Sigurdson and the evidence admitted at the evidentiary hearing as well as all the files, records and proceedings herein, the Court recommends that the petition to determine the mental status of respondent James Brown be granted and that respondent be committed to the custody of the Attorney General for the care and treatment of his mental illness in a suitable facility like FMC Rochester until he is no

longer in need of treatment or until the expiration of his sentence, whichever occurs earlier.

Dated: October 31, 2005

                                                s/ Arthur J. Boylan
                                                ARTHUR J. BOYLAN
                                                United States Magistrate Judge